3: 05cv 426 (H)

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | | DATE | 21ST MARCH 2005 |
|---|---|---|---|
| NAME OF SERVER   NOEL WHITEHEAD | | TITLE | PROCESS SERVER |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant. Place where served: _____

✓  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left:   MS. LEWIS

☐  Returned unexecuted: _____

_____

_____

_____

☐  Other (*specify*): _____

_____

*ORIGINAL*

## STATEMENT OF SERVICE FEES

| TRAVEL    4 KM. | SERVICES | TOTAL    60. 00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   21ST MARCH 2005
          *Date*

*Signature of Server*

1275 PACIFIC STREET, VANCOUVER, B.C.
*Address of Server*
          CANADA .

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

APR 11 2005

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

ORIGINAL



## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION

        Plaintiff,

v.

RONALD J. BAUER

        Defendants.

Case No.: 3-05CVO. 426.-H

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
        FILED

     APR 11 2005

CLERK U.S. DISTRICT COURT
By_____
                Deputy
```

### AFFIDAVIT OF SERVICE

I, NOEL WHITEHEAD of the City of Vancouver, in the Province of British Columbia, Canada, Process Server, MAKE OATH AND SAY AS FOLLOWS:

THAT in this action now produced to me and marked Exhibit 'A', to this my affidavit is a SUMMONS IN A CIVIL ACTION.

1.  THAT on March 21st 2005, after unsuccessfully attempting to serve true copies of the SUMMONS IN A CIVIL ACTION and SUMMARY herein, on the Defendant RONALD J. BAUER, at his place of residence at #1001-1328 Marinaside Crescent, Vancouver, British Columbia, I served true copies of those documents on that Defendant by leaving them in a sealed envelope addressed to that Defendant at that place of residence at 9:00 o'clock in the forenoon, with someone who appeared to be an adult member of the same household, and by subsequently mailing true copies of those documents addressed to the Defendant at that place of residence on March 21st 2005.

SWORN before me at Vancouver
British Columbia this 21st day of
March 2005.

_____
A Commissioner For Taking
Affidavits For British Columbia

_____
NOEL WHITEHEAD

ROBERT A. FINLAY
BARRISTER & SOLICITOR
SUITE 2200, 1055 DUNSMUIR ST.
P.O. BOX 49122, VANCOUVER, B.C. V7X 1J1
TELEPHONE (604) 683-8493



C O P Y



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR - 2 2005

CLERK, U.S. DISTRICT COURT
By _____
          **Deputy**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**



SECURITIES AND EXCHANGE COMMISSION,  :

                                    :

                    Plaintiff,      :

                                    :     **Civil Action No.**

        vs.                         :

                                    :     <u>COMPLAINT</u>

RONALD J. BAUER,                    :

                                    :     3 - 0 5 C V 0. 4 2 6. - H

                    Defendant.      :

                                    :

Plaintiff Securities and Exchange Commission alleges:

<u>**SUMMARY**</u>

1.     This matter involves a pump-and-dump market-manipulation scheme masterminded by Defendant Ronald J. Bauer ("Bauer"). From November 2002 through January 2003, Bauer pumped the stock of The Bauer Partnership Inc. (the "Bauer Partnership") by issuing false and misleading press releases, while secretly dumping tens of millions of Bauer Partnership shares into the inflated market he had created. Bauer profited by $1.5 million from the scheme, helping fund a lavish lifestyle.

2.     During the relevant period, Bauer was the CEO, president and a director of the Bauer Partnership, a public company that traded on the Over-the-Counter Bulletin Board. Bauer controlled the corporation and directed its activities. Beginning in November 2002, with Bauer at the helm, the Bauer Partnership issued a series of false and misleading press releases announcing a dizzying array of purported acquisitions in a diverse range of industries, including sports and leisure, resources and gourmet food. While trumpeting the business prospects arising

from the claimed acquisitions, Bauer failed to disclose that the company was cash-strapped and debt-laden. Nor did Bauer disclose that there was no probability of completing any of the acquisitions, none of which ever materialized. Indeed, Bauer had no intention on following through on any of the purported acquisitions.

3.    Nonetheless, the misleading press releases, which Bauer released simultaneously with similarly misleading e-mails, faxes and newsletters, had the desired effect of stimulating demand, supporting the Bauer Partnership share price and increasing its trading volume. Before the promotional campaign began, there was almost no market for Bauer Partnership stock. From October 1 through October 23, 2002, a mere 8,000 shares of Bauer Partnership stock changed hands, with an average daily volume of fewer than 500 shares. During November, December and January, when Bauer issued the false and misleading press releases, average daily volume soared to 1.4 million shares.

4.    The increased demand worked to Bauer's economic advantage. In late 2002 and early 2003 he filed with the SEC Form S-8 registration statements and issued some sixty million free-trading shares, principally to his nominees – including several offshore shell companies. Shortly after receiving the purportedly unrestricted shares, Bauer's nominees secretly began dumping them into the inflated market and transferring the proceeds to Bauer.

5.    Among Bauer's nominees was Panamanian paralegal Juan Javier Lopez. At Bauer's direction, Lopez formed a Panamanian shell company called Whitesands Ventures Consulting, S.A. Bauer claimed in an S-8 registration statement that Whitesands would receive 3.5 million shares of stock in exchange for performing consulting services regarding mergers and acquisitions. In reality, Lopez was not capable of performing, and was not asked to perform, such services. Instead, he established an account in the name of Whitesands at Panamanian

RE: SEC v. Bauer                                                                                                    2
*Complaint*

broker-dealer Thales Traders, S.A., received Bauer Partnership stock, sold it at Bauer's direction using Dallas-based clearing broker Penson Financial Services and distributed the proceeds – approximately $545,000 – to Bauer and his designees. Bauer paid him approximately $10,000 for these services.

6.      Former Bauer sidekick Myron Gushlak was another nominee. After the Panamanian broker-dealer became concerned at the extent of Lopez's selling in the Whitesands account, Bauer sought out Gushlak to be his straw man. Gushlak agreed to play that role and sold millions of shares for Bauer. Additionally, Bauer nominees Pacific West Holdings and EAMC also sold S-8 shares and funneled proceeds to Bauer.

7.      Bauer, who never disclosed his prodigious stock sales, profited by approximately $1.5 million through his blatant stock manipulation and secret dumping of Bauer Partnership stock. Bauer used the bulk of those funds to support a lavish lifestyle, *e.g.*, to cover monthly payments of $15,000 on a Cayman Islands vacation home and make a down payment on a $3 million condominium in South Beach, Miami. He also paid cash for a million-dollar property in Vancouver in May 2003 and enjoys a fleet of late-model luxury automobiles, including a Ferrari Spyder and three Mercedes. In 2004, he purchased a Sea Ray 420 Sundancer 45-foot yacht.

8.      The Commission, in the interest of protecting the public from further fraudulent activities, brings this action seeking an order permanently enjoining Bauer from further violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), 77e(c) and 77q(a)], Sections 10(b), 13(d) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act")[15 U.S.C. §§ 78j, 78m, and 78p] and Rules 10b-5, 13d-1 and 16a-3 thereunder [17 C.F.R. § 240.10b-5, 240.13d-1, and 240.16a-3]. The Commission further seeks an order barring Bauer from (a) serving as an officer or director of a publicly traded company

under Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d) of the Exchange

Act [15 U.S.C. § 78u(d)] and (b) participating in an offering of penny stock under Section 20(g)

of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. §

78u(d)(6)].  The Commission also seeks an order permanently enjoining Bauer from aiding and

abetting any public company's violations of Section 13(a) of the Exchange Act of 1934 [15

U.S.C. § 78m(a)] and Rules 13a-11, 13a-13 and 12b-20 [17 C.F.R. § 240.13a-11, 240.13a-13 and

240.12b-20] thereunder.  Finally, the Commission seeks an order requiring Bauer to disgorge all

ill-gotten gains, plus prejudgment interest thereon, and to pay civil monetary penalties.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under Section 22(a) of the Securities

Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendant

has, directly and indirectly, made use of the means or instrumentalities of interstate commerce

and/or the mails in connection with the activities described in this Complaint.

10.     Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]

and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts and

transactions described herein took place in the Northern District of Texas.  For example, Dallas-

based clearing broker Penson Financial Services cleared a large portion of the fraudulent trades

at issue, including transactions by Panamanian shell company Whitesands Ventures and Bauer

nominees Pacific West Holdings and EAMC; Bauer represented that he had engaged private

equity firm The Crescent Fund, which maintains offices in Dallas and other locations, to assist

with fundraising; Bauer disseminated false and misleading press releases into the Northern

District of Texas; and, finally, during the relevant period, certain Bauer Partnership shareholders

resided in the Northern District of Texas.

RE:  SEC v. Bauer                                                                                        4
*Complaint*

## DEFENDANT AND ENTITIES INVOLVED

11.   **Ronald J. Bauer**, 30, is a Canadian citizen who currently resides in Vancouver, British Columbia.  Bauer has also resided in London, New York, Miami, Israel and the Cayman Islands.  Bauer was president, CEO and a director of the Bauer Partnership during the relevant period.  Bauer later sold the Bauer Partnership public shell.  A self-proclaimed "financier," Bauer refused to cooperate with the SEC's investigation.  He refused to authorize his attorney to disclose his whereabouts.  This refusal forced the Commission to expend additional investigative resources locating Bauer.  In addition, through his attorney, Bauer represented to the SEC that he retained no documents from his tenure with the Bauer Partnership.

12.   **The Bauer Partnership, Inc.**, a Nevada corporation with offices in New York, New York, is a reporting company registered with the SEC under section 12(g) of the Exchange Act.  During the relevant period, it claimed to be a diversified holding company specializing in acquiring commercial real estate assets, as well as exploiting sports, leisure and resource opportunities.  The company's common stock formerly traded under the ticker symbol BUER on the OTC Bulletin Board.  The Bauer Partnership changed its name to Harbour Front Holdings in January 2003.  In late 2003, Bauer sold the public shell to an unrelated business.

13.   **Penson Financial Services, Inc.** is a clearing broker headquartered in Dallas, Texas.  A clearing broker handles the confirmation, settlement and delivery of transactions, fulfilling the main obligation of ensuring transactions are made in a prompt and efficient manner. Penson cleared a large portion of the trades at issue in this case.

# FACTS

### A.    The Pump: Fraudulent Promotional Campaign

#### 1.    Bauer Takes Control of a Public Company

14.    Bauer became the president and chief executive of a public company in December 2001 by engineering a reverse merger with Finders Keepers, Inc., a public shell incorporated in Nevada.  Before the reverse merger, the Bauer Partnership was a private company purportedly engaged in investment banking.  Following the reverse merger, Bauer changed the company's name to the Bauer Partnership and launched an unsuccessful foray into the commercial real estate business.  Although Bauer announced several proposed acquisitions, none were completed.  Throughout the events at issue in this case, Bauer dominated and controlled all corporate activities of the Bauer Partnership.

15.    The Bauer Partnership's third quarter 2002 Form 10-QSB, dated September 30, 2002, and filed November 14, 2002, revealed that the company had essentially no cash and no revenues, but had amassed $1.2 million in debt.  The filing also disclosed that the Bauer Partnership was in default on loans from Ocean Strategic Holdings Ltd. and Turbo International Ltd.  The 10-QSB stated that the loans had been renegotiated, but that a payment of $170,000 was due on November 30, 2002.  If the Bauer Partnership failed to make the payment, the lenders could foreclose on 50 million shares of Bauer Partnership stock and seize control of the corporation.

#### 2.    Bauer Bombards the Market with Misleading Press Releases

16.    From November 12, 2002 until January 31, 2003, Bauer issued a string of more than twenty press releases regarding impending acquisitions in diverse industries such as real

estate, sports and leisure, resources and gourmet food.   The releases, which were issued contemporaneously with virtually identical fax and e-mail blasts, typically contained unsupported, baseless projections of revenue generation and substantial profitability.   While touting the company's prospects in the press releases, Bauer failed to disclose that he had no intent or ability to consummate any of the transactions.   Nor did he disclose that Bauer Partnership's precarious financial condition, as reflected in the third quarter 2002 Form 10-QSB, made it extremely unlikely that these acquisitions and any resulting benefit to the company would come to fruition.   Significantly, he also failed to disclose that he was secretly dumping millions of shares of Bauer Partnership stock, as explained at Part B below.

### a.      Reforestation of Panama

17.      Bauer began the promotional campaign with a November 12, 2002 press release announcing that a Bauer Partnership subsidiary, Bauer Panama Reforestation Corporation, had entered into an agreement with a Panamanian company, Tropical Resources, SA, to develop and market thousands of hectares of forest land "in an effort to promote environmentally friendly and ethical investments in Panama."   The press release claimed that Bauer Panama would receive 20% of the revenues generated "from the sale of 1,000+ hectares of forest land worldwide."   Tropical Resources, SA was purportedly headquartered at Suite 1803, World Trade Center, Panama City, Panama – the same address as Whitesands Ventures (the Panamanian shell company established by Juan Javier Lopez for Bauer, as discussed below at Part B.2).   In truth, Bauer had no intention or financial capability of developing and marketing Panamanian forestland.

18.      The third quarter 2002 Form 10-QSB contained similar materially false and misleading information about the purported Panamanian venture:

RE: SEC v. Bauer                                                                               7
*Complaint*



> In November 2002, the Company entered into an agreement with
> Tropical Resources SA of Panama to develop and market a
> reforestation project. The Company has formed a wholly-owned
> subsidiary, Bauer Panama reforestation Corporation, to manage the
> new development project and to market the forest land. Bauer
> Panama is entitled to 20% of all sales originated through its
> introduction. The reforestation project is expected to begin its
> marketing program in January 2003.

This filing was false and misleading because Bauer had no intention or financial capability of developing and marketing Panamanian forestland.

### b.   World Golf League

19.   On November 22, 2002, Bauer announced the signing of a "Multi-Million Dollar Letter of Intent to Acquire The World Golf League." The World Golf League claimed to afford amateur golfers the opportunity to participate in pay-for-play, pro-style golf tournaments. In this release, Bauer projected that the World Golf League would generate revenues in excess of $3.5 million dollars in 2002, $30 million dollars in 2003 and $100 million dollars in 2006, and misrepresented that both companies expected to complete the acquisition in the next few days.

20.   Three days later, on November 25, 2002, the Bauer Partnership announced that it had retained a private equity firm, The Crescent Fund, to assist in raising capital to fund the closing of the World Golf League transaction. Specifically, the press release claimed that "Bauer ha[d] engaged Crescent Fund to assist in raising $2-$4 million in equity in order to close the WGL acquisition and others that will be forthcoming in the coming weeks." But in reality, the parties had no agreement to raise $2-$4 million in capital for the purpose of closing the World Golf League acquisition. Rather, the parties merely had an oral agreement to assist in raising an unspecified amount of capital for general purposes. In addition, Crescent's principal did not authorize his quote that appeared in the press release.

21.     The next day, November 26, 2002, Bauer issued yet another press release, this time announcing that the Bauer Partnership had completed its due diligence on the World Golf League transaction, only two business days after the announcement of the letter of intent.   In truth, Bauer had performed no due diligence, and no final agreement was ever signed.

### c.     Stock Repurchase Plan

22.     On November 25, 2002 – even as Bauer was trumpeting his World Golf League negotiations and supposedly completing due diligence on that deal – Bauer found time to issue another press release, announcing that the Bauer Partnership's board of directors had "authorized the repurchase of up to 10,000,000 of its shares of its common stock representing approximately 20% of the outstanding shares of the company."   There was no indication of how the purchases would be funded, even though the Bauer Partnership's most recent filing reflected no cash or revenues and raised serious doubts about its solvency.   The only identified source of financing was the Crescent Fund, which supposedly was going to help locate $2-4 million.   But even those speculative funds were earmarked for the World Golf League and other acquisitions, according to Bauer.

23.     In the release, Bauer stated:

> The company believes that its shares are currently undervalued and represent a very attractive investment opportunity for the company and its investors alike.   We believe that after a hard year of restructuring our debt and reducing our liabilities and overhead costs, we are currently poised for strong growth in the coming year.   We have begun to execute on a master plan to change our vision and close on various revenue generating acquisitions which will reflect profitably and beneficial enhancements to our balance sheet...

Bauer did not truly believe the shares were "undervalued" or that the company was "poised for strong growth" with no cash in the coffer and only speculative business prospects.   Indeed, Bauer

RE:  SEC v. Bauer                                                                          9
*Complaint*

had no intention of following through on any of the claimed acquisitions. Further, the release speaks as if the Bauer Partnership is a real company, with offices, employees and a functioning board of directors. In reality, the Bauer Partnership had no legitimate operations and was little more than a mechanism for Bauer's manipulation.

24.     This press release – like the others – was intended to stimulate demand for Bauer Partnership stock. Stock buybacks are commonly understood as signs that management is thinking of shareholders and believes the stock is a good buy. For this reason, Bauer was not content with just one press release on the stock repurchase authorization. The next day, November 26, 2002, Bauer issued another nearly identical press release announcing the board's authorization to repurchase up to 10,000,000 of its shares on the open market. Contrary to the press releases, there is no indication that any shares were actually repurchased.

### d.   Bauer Declares Success in Change of Vision to a Diversified Holding Company and Future Growth Strategy

25.     On November 29, 2002, Bauer Partnership proclaimed initial success in its "change of corporate philosophy from a real estate investment company to a diversified holding company in order to better maximize shareholder value." In the release, Bauer claimed the company was in final negotiations regarding another sports and leisure acquisition (in addition to the previously announced World Golf League) and a series of real estate development projects. A Bauer quote appeared in the release, stating that Bauer was "very confident" in the "success of our new vision and business model." He went on to say, "[w]e have been initially successful in implementing the first few stages of our new business plan and believe that we are on target to maintain and sustain the growth we have set forth for the coming months." These

representations were false, because Bauer had no intent or ability to complete any of the acquisitions.

### e.   **Wimbledon Unreal Grass**

26.   Bauer's next press release came three business days later.  On December 2, 2002, Bauer announced the signing of a letter of intent to acquire Wimbledon Unreal Grass, an Australian·artificial turf manufacturer.   The release declared that Wimbledon would realize revenues of $4M for the year 2002, with $650,000 in net income.   The release attributed the following quote to Wimbledon's CEO, Wayne V. Reid: "[w]e believe that Wimbledon will reach new heights and become a major global force in the industry with the financial resources and international affiliations of The Bauer Partnership."  It is not clear what "financial resources" and "international affiliations" Bauer claimed to have, but as the third quarter 2002 Form 10Q-SB revealed, the Bauer Partnership was seriously lacking in resources.   Like the other purported acquisitions, the Wimbledon Unreal Grass transaction never closed.

### f.   **Fat-to-Fit**

27.   Three days later, on December 5, 2002, Bauer announced that the Bauer Partnership had signed an agreement to acquire 33.3% interest of F3 Fitness, LLC.  F3 Fitness claimed to own a nutritional supplement, "Fat to Fit," described as a state-of-the-art product that contained anti-aging and skin-toning agents designed to rejuvenate skin while tightening and toning muscle.  Bauer claimed that the supplement – "generally regarded as safe" – would be ready to hit the market in a few weeks with product sales expected to generate revenues of $25 million in 2003, $45 million in 2004 and $90 million in 2005.  Bauer supplied no basis for these glowing revenue projections arising from a start-up product that was weeks away from reaching the market.  In truth, F3 Fitness was owned by an individual who lived upstairs from Bauer in the

RE: SEC v. Bauer                                                                                    11
*Complaint*

same apartment complex in Miami. Bauer never had any intention of bringing the purported supplement to market.

28.    The same day, December 5, 2002, Bauer issued yet another press release announcing that the Bauer Partnership was "ready to capitalize" on the "$34 Billion Health and Fitness Industry" with the 33.3% acquisition of the issued and outstanding membership interests of F3 Fitness. The press release repeated the same descriptions of F3 and Fat to Fit, as well as the phenomenal, unsupported revenue projections. A Bauer quote stated that the Bauer Partnership was building a foundation of private companies to support the public company "for years to come." In reality, the Bauer Partnership was not "ready to capitalize" on anything, particularly with an untested diet supplement developed by Bauer's upstairs neighbor. Nor was Bauer concerned with the long-term health of the public company, contrary to his "years-to-come" quote.

29.    On December 10, 2002, Bauer announced the signing of an agreement with MSI, Inc., described as a large Orlando-based fulfillment center to handle live telephone orders, on-line orders, payment processing and product shipping of F3 Fitness's nutritional supplement -- "Fat to Fit." Bauer stated, "We have been working hard to find the right fulfillment center to handle orders, payment processing and product shipping properly." Though Bauer had no intention of bringing the product to market, he misled the investing public to believe that sales were so imminent as to require a fulfillment center.

g.    **Caviar Universe**

30.    The next day, December 11, 2002, the Bauer Partnership announced its entry into the "$27 Billion gourmet food industry" with the acquisition of a 33% interest of an online gourmet food retailer named Caviar Universe. Bauer stated he would provide marketing

expertise and services to the online retailer in exchange for a 33% interest in Caviar Universe, LLC.  But Caviar Universe, which was owned by promoter-friends of Bauer's, was never a legitimate business.  And when the press release was issued, the "online" retailer had no web-site.

### h.    Ocean Strategic and Turbo Holdings

31.    On December 16, 2002, an online investment publication published an article questioning Bauer's "breathtaking" string of press releases, and noting that Bauer was in default on loans to offshore lenders.  Later that day, Bauer issued a press release stating that the Company had made several payments to lenders Ocean Strategic and Turbo International and now owed approximately $145,000 in principal and interest.  Bauer's December 16 press release failed to disclose, however, that the default allowed the lenders the right to demand 50 million shares of Bauer common stock and control of the company.  It was not until January 6, 2003, that Bauer mentioned the prospect of foreclosure.  On that date, another press release explained that an unidentified representative of Ocean Strategic Holdings and Turbo International had represented orally to the Bauer Partnership that there would be no foreclosure by Ocean Strategic Holdings and Turbo International if the Bauer Partnership continued to make periodic payments. Even then, Bauer did not disclose how the cash-strapped Bauer Partnership was making payments.

### i.    Purported $30 Million Debt Portfolio

32.    Bauer issued another glowing press release the next day, December 17, 2002.  In that release, Bauer announced an agreement to acquire a $30 million bank and credit card debt portfolio from EH&P Investments AG of Zurich, Switzerland, which it described as a large Swiss investment group.  According to the release, Bauer acquired the $30 million debt portfolio

RE:  SEC v. Bauer                                                                                            13
*Complaint*

for $2 million in restricted shares issued at $.20 per share under a lock-up agreement. In reality, although an agreement had been signed, Bauer had only acquired $6 million of debt. Bauer never paid for the remaining $24 million.

33.     The next day, December 18, 2002, Bauer Partnership announced an agreement with Intensive Collection Services LLC for the management and liquidation of $30 million worth of non-performing consumer debt. According to the press release, ICS would perform collection services with the debt portfolio being legally assigned by the Bauer Partnership to ICS for the purpose of liquidating the accounts in the portfolio. The release further explained that the proceeds from collection activity would be distributed 60% to ICS and 40% to the Bauer Partnership. Bauer stated:

> By handing over the management and liquidation of this large $30M debt portfolio to a company like ICS with over 20 years of experience, we can now focus our efforts on acquiring additional debt portfolios with common stock and cash.

34.     Far from a seasoned collection service with "20 years of experience," ICS consisted of a single individual operating from a rented mailbox in Los Angeles. Six months later, ICS was the subject of a desist-and-refrain order issued by the California securities regulators – the Department of Corporations – on June 8, 2003. The order contained findings that ICS was engaged in the "unqualified" offer or sale of securities in California. ICS was ordered to desist and refrain from such activities.

35.     In the press releases, Bauer claimed to expect to realize $1.2M in profits from the purported $30M debt acquisition. This claim was baseless because, as Bauer later admitted, the Bauer Partnership had only acquired $6 million of the debt portfolio, and never realized any



profits. Further, the announced agreement with ICS was a sham, as ICS was not a legitimate debt-collection service.

### j.   Bauer Announces Website Launches

36.   On January 7, 2003, Bauer issued a press release announcing the launching of the Fat-to-Fit e-commerce website. Two days later, he announced that Caviar Universe had gone on-line. These press releases were intended to signal financial soundness and that the Bauer Partnership was moving toward profitability, a claim that was made expressly with the next press release.

### k.   Baseless Forecast of 2003 Year End Results

37.   One day after announcing the launching of the Caviar Universe website, Bauer issued a press release proclaiming that "[t]he Bauer Partnership, Inc. Expects to be Profitable for the Year Ended December 31, 2003." In this January 10, 2003, release, Bauer stated, "I believe that The Bauer Partnership is an extremely attractive investment. Based upon our recent acquisitions, our shareholders will have the ability to take advantage of opportunities from our diversified portfolio of high growth companies. These recent acquisitions are all geared toward improving our bottom line." Bauer further stated that (i) F3 Fitness expected revenues in excess of $25 million in 2003 with a profit of more than $14,000,000; (ii) the Bauer Partnership had acquired a 33.3% of Caviar Universe, which was expected to generate a substantial profit; (iii) the Bauer Partnership expected to realize $1.2 million in profits from the purported $30 million debt acquisition; and (iv) the Bauer Partnership was continuing its efforts to complete a transaction with Wimbledon Unreal Grass whereby it would become a wholly-owned subsidiary of Bauer, which would generate $4 million in revenue, with $650,000 in net income.

38.     Bauer's press release touted profit expectations of nearly $30 million for year ended December 2003. These forecasts of extravagant profitability were facially absurd for an enterprise with no cash, no revenues and no functioning business. When this release was issued, the Bauer Partnership had not closed on a single acquisition of a company with a viable business. Bauer's projection was baseless, as Bauer had no intention or capability of following through on any of the acquisitions.

### l.     Name Change to Harbour Front Holdings

39.     On January 27, 2003, Bauer announced a name change to Harbour Front Holdings, Inc., purportedly to "better reflect the company's current operations as a holding company." But the true reason for the change was to remove Bauer's name from the forefront.

### m.     Urbani Holdings

40.     On January 31, 2003, Harbour Front announced that it had entered into a joint venture agreement with Urbani Holdings, Inc. a distributor of gourmet and specialty foods. Under the joint venture, the parties would form a limited liability company to market gourmet products. Bauer projected revenues from the venture of $2 million in 2003, $4 million in 2004 and $6 million in 2005, of which Harbour Front would receive 40%. Under the agreement, Harbour Front agreed to provide marketing, financing, hosting and design services for the website. Harbour Front never provided any services, aside from arranging for the launching of a website, and the agreement was terminated after a brief period.

41.     Bauer authored and approved each of the press releases in the promotional campaign. During the campaign, Bauer dominated and controlled every aspect of the Bauer Partnership. He was responsible for the false claims of financial soundness, wild profitability and myriad acquisitions. He was also responsible for omissions relating to his lack of intention

RE:   SEC v. Bauer                                                                              16
*Complaint*



or ability to complete any of the acquisitions, his secret dumping of Bauer Partnership shares (as discussed below) and the Bauer Partnership's precarious financial condition.

**B.    The Dump: Illicit, Secret Stock Sales at Artificially Inflated Prices by Bauer Nominees and Offshore Companies**

**1.    The Bauer Partnership Registers 60 Million Shares**

42.    The Bauer Partnership registered more than 60 million shares pursuant to Form S-8 registration statements between October 2002 and February 2003, coinciding with the promotional campaign alleged above.

43.    On October 28, 2002, the Bauer Partnership filed a Form S-8 registering 3.5 million shares provided to a Panamanian entity called Whitesands Ventures, S.A., in exchange for purported consulting concerning "corporate mergers and acquisitions and long range planning and business development."

44.    Bauer issued 57 million more S-8 shares on the following schedule:

- On November 13, 2002, the Bauer Partnership filed a Form S-8 for its 2002 non-qualified stock option plan and registered 5 million shares.

- On January 15, 2003, the Bauer Partnership filed a Form S-8 for its 2003 non-qualified stock option plan and legal services and registered 10.5 million shares.

- On January 24, 2003, the Bauer Partnership filed an Amended S-8, increasing to 15 million the number of shares to be registered under the 2002 non-qualified stock option plan.

- On February 3, 2003, the newly named Harbour Front filed a Form S-8, registering 18.5 million shares, including 18 million for its 2003 amended non-qualified stock option plan. The remaining 500,000 shares were apparently for legal services.

- On February 4, 2003, Harbour Front filed another Amended Form S-8, without specifying which S-8 it was amending, and registered



another 3 million shares under the 2003 non-qualified stock option plan.

- On February 18, 2003, Harbour Front filed a Form S-8 for stock issuance for legal services, long range corporate planning and business development, and marketing. The company registered 10 million shares under this filing.

### 2. Bauer Distributes S-8 Shares to Nominees and Offshore Companies, Who Sell into the Inflated Market

45.    Bauer abused the S-8 registration process by distributing tens of millions of shares to nominees. In fact, it does not appear that any significant shares were distributed to bona fide consultants, employees or other service providers.

46.    For example, the October 28, 2002 Form S-8 registered 3.5 million shares for distribution to purported mergers-and-acquisitions consultant Whitesands Ventures. Juan Javier Lopez, the individual who signed the agreement as Whitesands' president president, is a Panamanian paralegal. Lopez was not capable of performing and was not asked to perform consulting services on corporate mergers and acquisitions. Instead, he functioned as a nominee for Bauer.

47.    Further, even though only 3.5 million shares were registered under the registration statement pertaining to Whitesands, 6.5 million shares were ultimately issued. Lopez sold the shares into the inflated market at Bauer's direction – using Dallas-based clearing broker Penson Financial Services – and transferred the proceeds of approximately $545,000 to Bauer. The following chart illustrates Lopez's receipt and sales of S-8 shares:

**Juan Javier Lopez**

| Shares Received: | | Stock Price at Receipt | Value |
|---|---|---|---|
| 10/28/2002 | 3,500,000 | $ 0.12 | $420,000.00 |
| 12/5/2002 | 2,000,000 | $ 0.09 | $180,000.00 |
| 12/9/2002 | 500,000 | $ 0.09 | $ 45,000.00 |
| 12/10/2002 | 500,000 | $ 0.06 | $ 30,000.00 |
| | 6,500,000 | | $675,000.00 |

**Stock Transferred:**

| | | Proceeds When Sold |
|---|---|---|
| 11/1/2002 500,000 Transferred to Monetary Advancement Intl, who subsequently sold on 11/8/02 (Deborah Burghard and Raymond Burghard). | | $ 125,000 |
| 11/12/2002 3,000,000 Transferred to Penson Financial Services Inc, Which subsequently sold on 11/18/02. | | $ 210,000 |
| 12/17/2002 2,000,000 Transferred to Penson Financial Services Inc, which subsequently sold on 12/23/02. | | $ 140,000 |
| 12/18/2002 500,000 12/18/2002 500,000 Transferred to Penson Financial Services Inc, which subsequently sold on 12/26/02. | | $ 70,000 $ 545,000 |

48.    When the Panamanian broker became suspicious of the high-volume trading, Bauer chose another straw man.  Gushlak agreed to play that role and split the proceeds of $620,000 with Bauer, as reflected in the following chart:

**Myron Gushlak/Riviera Holdings/Tyson Investments**

| Shares Received: | | Stock Price at Receipt | | Value | |
|---|---|---|---|---|---|
| 11/15/2002 | 4,000,000 | $ | 0.20 | $ | 800,000.00 |
| 12/5/2002 | 2,000,000 | $ | 0.09 | $ | 180,000.00 |
| 12/5/2002 | 2,000,000 | $ | 0.09 | $ | 180,000.00 |
| | 8,000,000 | | | | $1,160,000.00 |

**Stock Transferred:**

|  | Proceeds When Sold |
|---|---|
| 11/27/2002    4,000,000 Transferred to Finter Bank in Switzerland and Brown Brothers Harriman in NY.  Subsequently sold on 12/9/02 and 12/11/02. | $   420,000 |
| 12/27/2002    2,000,000 Transferred to Rush & Co., which subsequently Sold on 1/8/03. | $   100,000 |
| 12/27/2002    2,000,000 Transferred to Rush & Co., which subsequently Sold on 1/8/03. | $   100,000 |
| | $   620,000 |

49.    In addition, Bauer directed the issuance of 12.5 million S-8 shares between December 9, 2002 and February 18, 2003 to Bauer nominee Pacific West Holdings.  Pacific West sold them, using Dallas-based clearing broker Penson Financial Services, realizing profits for Bauer of approximately $226,000, as reflected below:

**Pacific West Holdings**

| Shares Received: | | Stock Price at Receipt | | Value |
|---|---|---|---|---|
| 12/9/2002 | 300,000 | $ | 0.09 | $ 27,000.00 |
| 1/2/2003 | 1,000,000 | $ | 0.07 | $ 70,000.00 |
| 1/9/2003 | 751,933 | $ | 0.05 | $ 37,596.65 |
| 1/16/2003 | 1,000,000 | $ | 0.04 | $ 40,000.00 |
| 1/22/2003 | 500,000 | $ | 0.04 | $ 20,000.00 |
| 1/31/2003 | 2,599,755 | $ | 0.03 | $ 77,992.65 |
| 2/18/2003 | 6,400,000 | $ | 0.01 | $ 64,000.00 |
| | 12,551,688 | | | $336,589.30 |

| Stock Sales: | | Price | | Proceeds |
|---|---|---|---|---|
| 12/27/2002 | 300,000 | $ | 0.07 | $ 21,000.00 |
| 1/13/2003 | 1,000,000 | $ | 0.05 | $ 50,000.00 |
| 1/24/2003 | 751,933 | $ | 0.04 | $ 30,077.32 |
| 1/28/2003 | 1,000,000 | $ | 0.03 | $ 30,000.00 |
| 2/18/2003 | 2,599,755 | $ | 0.01 | $ 25,997.55 |
| 3/25/2003 | 500,000 | $ | 0.01 | $ 5,000.00 |
| | 6,151,688 | | | $162,074.87 |

| Stock Transferred: | | | Proceeds When Sold |
|---|---|---|---|
| 3/14/2003 | 6,400,000 | Transferred to Penson Financial Services Inc, | |
| | | which subsequently sold on 3/20/03. | $64,000.00 |

50.     Bauer also directed the issuance of 2 million shares of S-8 stock to Bauer nominee

EAMC. EAMC sold using Dallas-based clearing broker Penson Financial Services and realized

$40,000 in profits, as reflected in the table below:

RE: SEC v. Bauer                                                                                    21
*Complaint*



**EAMC**

| Shares Received: | | Stock Price at Receipt | Value |
|---|---|---|---|
| 2/18/2003 | 2,000,000 | $ 0.01 | $ 20,000.00 |

**Stock Transferred:**

| | | Proceeds |
|---|---|---|
| 3/4/2003 2,000,000 | | **When Sold** |
| Transferred to Penson Financial Services Inc, | | |
| Who subsequently sold on 3/10/03. | | $ 40,000.00 |

### 3. Bauer, Through Offshore Shell Companies, Sells Bauer Partnership Stock into the Inflated Market

51.     Bauer also caused the Bauer Partnership to issue Treasury shares to Bauer and three Bauer-controlled offshore shell companies: Tylo Enterprises, Blue Star Holdings and Fleming Financial Ltd. Specifically, on October 28, 2002, he directed the issuance of 1 million shares, valued at $120,000, to Fleming Financial Holdings. In addition, on February 24, 2003 Bauer directed the issuance of Bauer Partnership shares as follows: (a) 5 million shares, valued at $50,000, to Bauer nominee Tylo Enterprises; (b) 2.5 million shares, valued at $25,000, to Bauer nominee Blue Star Holdings; and (c) 2.5 million shares, valued at $25,000, to Bauer nominee Fleming Financial Holdings. Bauer's use of these entities to hold Bauer Partnership stock betrays a deliberate attempt to evade the beneficial-ownership requirements.

52.     Bauer also received proceeds from his nominees' sale of S-8 shares, profiting by approximately $1.5 million. Bauer used the funds to support a lavish lifestyle. For example, the proceeds funded monthly payments of $15,000 on a Cayman Islands vacation home, a down payment on a $3 million condominium in South Beach, Miami, and other luxury items.

C.     **March 2003 Form 8-K – Things Did Not "Work Out"**

53.     During the relevant period, issuers like the Bauer Partnership were required to file Form 8-K current reports upon the occurrence of any of the following events: changes in control; acquisition or disposition of a significant amount of assets; bankruptcy or receivership; changes in certifying accountant; resignation of directors; and changes in Code of Ethics. [17 C.F.R. § 240.308 and Form 8-K, Items 1-10]. While announcing impending acquisitions and selling Bauer Partnership stock at a breakneck pace, however, Bauer did not file a single Form 8-K.

54.     But on March 10, 2003, Harbour Front filed a Form 8-K stating that revenue projections in previous releases were based upon "expectations of start-up companies" and agreements that did not "work[] out." The filing indicated that (i) it had "become clear that the revenue and earning projections [of F3 Fitness] previously stated will not be met," because "[v]arious things were supposed to happen" with F3 that had "not occurred to date;" (ii) it had "become evident" that Caviar Universe would not meet its 2003 revenue and earnings projections; (iii) the Bauer Debt Collection subsidiary had acquired not $30 million worth of non-performing debt (as previously announced), but only $6 million, and no revenues had been generated, making it "clear that the earning projections previously stated will not be met;" and (iv) it had terminated plans to acquire Wimbledon Unreal Grass.

55.     Although this 8-K filing signaled the conclusion of Bauer's pump-and-dump scheme, its half-truths, omissions and outright falsehoods concealed the real story of Bauer's fraud. The filing nowhere explained that Bauer had used secret nominees to dump tens of millions of Bauer Partnership stock, that he had never intended to complete any of the claimed

acquisitions or that, even if he had, the Bauer Partnership lacked financial resources sufficient to close on the purported transactions.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10-5

56.   Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

57.   Defendant, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

58.   As a part of and in furtherance of his scheme, defendant, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 55 above.

59.   Defendant made the referenced misrepresentations and omissions knowingly or with severe recklessness.

RE: SEC v. Bauer                                                                                        24
*Complaint*

60. By reason of the foregoing, defendant has violated and, unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violations of Section 17(a) of the Securities Act

61. Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

62. Defendant, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon purchasers of securities.

63. As part of and in furtherance of this scheme, defendant, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those statements and omissions set forth in paragraph 1 through 55 above.

64. Defendant made the referenced misrepresentations and omissions knowingly or with severe reckless.

RE: SEC v. Bauer
*Complaint*

25



65. By reason of the foregoing, Defendant has violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. 77q(a)].

### THIRD CLAIM

#### Violations of Section 5(a) and 5(c) of the Securities Act

66. Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

67. Defendant, directly or indirectly, singly or in concert with others: (a) without a registration statement in effect as to the securities, (i) made use of the means or instruments of transportation or communication or the mails to sell such securities through the use or medium of a prospectus or otherwise, or (ii) carried or caused to be carried through the mails, or in interstate commerce, by any means or instruments of transportation, such securities for the purpose of sale or for delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise securities for which a registration statement had not been filed as to such securities.

68. By reason of the foregoing, Defendant has violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. 77e(a) and 77e(c)].

### FOURTH CLAIM

#### Violations of Section 13(d) of the Exchange Act and Rules 13d-1

69. Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

70. Section 13(d) of the Exchange Act and Rule 13d-1 thereunder require that any person that acquires more than 5% of a company's class of stock registered under Section 12 of

RE: SEC v. Bauer                                                                                    26
*Complaint*

the Exchange Act must notify the issuer and the Commission within 10 days of the acquisition. Exchange Act Rule 13d-2 requires that the person notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership.

71.    By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 13d-1 thereunder [17 C.F.R. 240.13d-1, 13d-2].

## FIFTH CLAIM

### Violations of Section 16(a) of the Exchange Act and Rule 16a-3

72.    Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

73.    Section 16(a) of the Exchange Act and Rule 16a-3 thereunder require that any person that directly or indirectly beneficially owns more than 10% of a company's class of stock registered under Section 12 of the Exchange Act must notify the Commission within 10 days of the acquisition. Additionally, Section 16(a) of the Exchange Act requires that if there has been a change of such ownership during a month, the reporting persons shall file with the Commission a statement indicating their ownership at the end of the calendar month and the changes in that ownership that occurred during the month. Exchange Act Rule 16a-3 requires that initial statements of beneficial ownership be filed on Form 3, and that statements of changes in beneficial ownership be filed on Form 4.

74.    By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder [17 C.F.R. 240.16a-3].

## SIXTH CLAIM

### Aiding and Abetting Bauer Partnership's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 Thereunder

75.    Plaintiff Commission repeats and incorporates by reference paragraphs 1 through 55 of this Complaint.

76.    Section 13(a) of the Exchange Act requires issuers such as the Bauer Partnership to file periodic reports with the Commission containing such information as the Commission prescribes by rule.  Exchange Act Rule 13a-11 requires issues to file current reports, while Rule 13a-13 requires the filing of quarterly reports.  Under Exchange Act Rule 12b-20, the reports must contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading.

77.    The Bauer Partnership violated Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13 and 12b-20, thereunder, by filing a third quarter 2002 Form 10-Q and a March 10, 2003 Form 8-K that were false and materially misleading.  Specifically, the third quarter 2002 Form 10-Q contained false and misleading information about the Panamanian Reforestation project, which Bauer had no intention of completing.  In addition, the March 10, 2003 Form 8-K misled the public about the reasons the previous revenue projections did not "work out."  Bauer aided and abetted the issuer's reporting violations by supplying all information contained in these filings and signing as CEO.

78.    By reason of the foregoing, Bauer aided and abetted Bauer Partnership's violations of, and unless restrained and enjoined, will aid and abet further violations of Section

13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13].

## REQUEST FOR RELIEF

The Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendant, his agents, servants, employees, attorneys, and those in active concert or participation with Defendant, who receive actual notice by personal service or otherwise, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 and Sections 10(b), 13(d), and 16(a) of the Exchange Act of 1934 and Rules 10b-5, 13d-1 and 16a-3 thereunder, and from aiding-and-abetting violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-11 and 13a-13 thereunder.

### II.

Order Defendant to disgorge an amount equal to the funds and benefits he obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

### III.

Order Defendant to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], for his securities law violations.

### IV.

Permanently bar Defendant from serving as an officer or director of a publicly traded company under Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## V.

Permanently bar Defendant from participating in an offering of penny stock under Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VI.

Order all additional relief to which the Commission may be entitled.

Respectfully submitted,

DATED: 3-2-05

Toby M. Galloway
Texas Bar No. 00790733
Attorney for Plaintiff
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas 76102-6882
(817) 978-6447
(817) 978-4927 (Facsimile)

Of Counsel:

Spencer C. Barasch
Will J. Fergus

RE: SEC v. Bauer
*Complaint*

30

FedEx Express. *International Air Waybill*

Origin Copy

Not all services and options are available to all destinations.

**1 From**

Date 3/30/06

Sender's FedEx Account Number 1773-3849-4

Sender's Name Robert Finlay

Phone

Company GLM LIMITED PARTNERSHIP

Dept/Floor BENTALL IV

Address 1055 DUNSMUIR ST SUITE 2300

City VANCOUVER

Province BC CANADA Postal Code V7X1J1

**2 Your Internal Reference** 73955779 RAF

**3 To**

Recipient's Name Tobin Gallowa

Phone

Company US Securities 9 Exchange Commission

Address Burnett Plaza Suite 900

Address 201 Merry St Unit #2

City Fort Worth

State/Province TX

Country USA

ZIP/Postal Code 76102-3322

Recipient's TAX I.D. number required for Customs purposes
e.g. GST/RFC/VAT/EIN, or as applicable

**4 Shipment Information**

Total Packages 1

Total Weight 0.5 lb

DIM L / W / H

**5 Express Package Service**

Packages up to 150 lb./68 kg
For packages over 150 lb. (68 kg),
use the FedEx Expanded Service
International Air Waybill

☑ FedEx International Priority

☐ FedEx International First
Available to select locations
Regions apply.

☐ FedEx International Economy
FedEx Envelope and FedEx Pak are
not available.

**6 Packaging**

☑ FedEx Envelope ☐ FedEx Pak ☐ FedEx Box ☐ FedEx 10kg Box ☐ FedEx 25kg Box ☐ Other

**7 Special Handling**

☐ HOLD at FedEx Location ☐ SATURDAY Delivery

**8a Payment** *Bill transportation charges to:*

☑ Sender Acct. No. in Section 1 will be billed ☐ Recipient ☐ Third Party ☐ Credit Card ☐ Cash/Cheque

**8b Payment** *Bill Customs charges to:*

☑ Sender Acct. No. in Section 1 will be billed ☐ Recipient ☐ Third Party ☐ Cash/Cheque

**9 Required Signature**

Use of this Air Waybill constitutes your agreement to the Conditions of Contract on the back of this Air Waybill, and you represent that this shipment does not contain Dangerous Goods.

Sender's Signature

Date Executed 3/30/06

Origin Station LOY

Destination Station I.D.

8445 7989 2685 0412

Received By FedEx Emp. #

Freight